## McHenry et al. v. Clark, Jr., Mayor, et al.

Before MacNeille, P. J., Milner and Waters, JJ., en banc.

*Herbert S. Levin*, for city commissioners, plaintiffs.

*Charles E. Kenworthey* and *D. J. McCauley, Jr.*, for Board of Revision of Taxes and Registration Commission, intervening plaintiffs.

*Joseph E. Gold* for *William Lennox*, Sheriff, intervening plaintiff.

*Abraham L. Freedman*, city solicitor, for defendants.

MILNER, J., December 1, 1953.—The petition filed in this case is for a declaratory judgment declaring the validity or invalidity (i.e., constitutionality) of section 5 of the Act of August 26, 1953, P. L. 1476, of the Legislature of the Commonwealth of Pennsylvania, which was introduced in the legislature as Senate Bill No. 445, and, having been enacted by the General Assembly, was approved by Governor John S. Fine on August 26, 1953, and will be referred to hereafter as the Act of August 26, 1953. The original petition was filed by the City Commissioners of Philadelphia and thereafter, pursuant to stipulations of all parties in interest, the Sheriff of Philadelphia, the board of revision of taxes and registration commission, by the members thereof, were permitted to intervene as parties plaintiff. Defendants are the Mayor of Philadelphia, other administrative officers of the city and the members of the city council. Defendants filed an answer to the petition joining issue on the

legal questions and raising no important factual questions. Original plaintiffs and intervening plaintiffs have filed a motion for judgment on the pleadings.

The city, by its mayor and personnel director, also brought a complaint in mandamus in this court against the members of the board of revision of taxes, seeking an order compelling them to comply with the civil service requirements of the Philadelphia Home Rule Charter and the civil service regulations issued pursuant thereto. To this complaint defendants have filed preliminary objections challenging plaintiffs' legal right to such an order or judgment.

A citizen and resident of Philadelphia, in his own behalf and on behalf of all other residents and citizens who desire to join in his suit, filed a complaint in equity in Court of Common Pleas No. 4 of Philadelphia County, which case has been transferred to this court. Defendants in this suit are the sheriff, city commissioners and members of the board of revision of taxes and registration commission. The complaint in equity prays, inter alia, for an injunction enjoining defendants from violating the sections of the Home Rule Charter providing for civil service and banning political activity by employes of city offices. To this complaint one of the defendants, the Sheriff of Philadelphia, has filed preliminary objections, to wit, that the aforesaid Act of August 26, 1953, is constitutional and that the General Assembly of Pennsylvania may legislate with regard to matters contained in the Philadelphia Home Rule Charter.

By stipulations and agreements of counsel for all of the parties in the above cases they were consolidated and it was agreed that they be heard and decided together; that the preliminary objection in the declaratory judgment action be withdrawn; that a controversy exists between the various parties to these suits and that the pleadings in the declaratory judgment action shall be deemed to frame all the issues.

The Supreme Court having denied a petition for the issuance of a special certiorari (to take original jurisdiction of the cases) the consolidated cases came up for hearing before this court sitting en banc on November 12, 1953,[1] at which time counsel for all the parties agreed there were no factual disputes and that the only question involved is the legal question as to the validity of the Act of August 26, 1953. It was also agreed that the hearing be a final hearing and that this court enter a final judgment (order or decree as the case may be) from which any of the parties may take an appeal if they so desire.

Pursuant to the Home Rule Amendment of 1922 to the State Constitution and the First Class City Home Rule Enabling Act of 1949, the City of Philadelphia on April 17, 1951, adopted a Home Rule Charter, which provided, inter alia, that all officers and employes of the city (with certain exceptions not pertinent to the matters before us) shall be under civil service and prohibited from political activity (sections 7-301, 10-107). On January 5, 1953, the Supreme Court in Lennox v. Clark, 372 Pa. 355, held under the provisions of the so-called City-County Consolidation Amendment which became effective November 6, 1951, that all county officers became city officers, and that the civil service provisions and ban upon political activity in the charter applied to their employes. The sheriff and county commissioners were undoubtedly county officers and a majority of the Supreme Court in an opinion delivered by Chief Justice Stern held that the members of the board of revision of taxes and registration commission were also county officers who became city officers by virtue of the amendment. Subsequent to the rendering of this decision the Legislature of Pennsylvania passed Act No. 433 which was signed by the Governor on August 26, 1953, and be-

---

[1] The last supplemental brief was filed with this court on November 18, 1953.

came effective immediately upon its enactment. In section 5 of this act it is provided that "the provisions now or hereafter contained in the Philadelphia Home Rule Charter relating to civil service and prohibiting political activities by officers and employees of the City of Philadelphia shall be inapplicable to the Sheriff, City Commissioners, Board of Revision of Taxes and members thereof and the Registration Commission and members thereof, and the subordinates and employees of such officers, board and commission."

It is necessary in order to appraise the validity of section 5 of the Act of August 26, 1953, to consider the constitutional, legislative and judicial history or background of this controversy.

By the adoption in 1922 of an amendment to article XV, sec. 1, of the State Constitution, the General Assembly was empowered to enact legislation authorizing the adoption by municipalities of home rule charters. This power had not previously existed. We shall refer to this amendment as the Home Rule Amendment. Omitting matters not pertinent here, it provides that

". . . Cities, or cities of any particular class, *may be given* the right and power to frame and adopt their own charters and to exercise the powers and authority of local self-government, *subject, however, to such restrictions, limitations, and regulations, as may be imposed by the Legislature. . . ."* [2]

The legislature took no action under this amendment until 1949 when it passed the Act of April 21, 1949, P. L. 665, 53 PS §3421.1 et seq., which provided the machinery for the adoption of home rule charters by cities of the first class. It was under the provisions of this enabling act that the Philadelphia Home Rule Charter was drafted and submitted to the electorate of the city, who approved its adoption on April 17,

---

[2] Throughout this opinion the italics supplied will be ours unless specifically noted.

1951, and provided that it be effective, as to the matters we are considering, on January 7, 1952.

The Act of 1949 was limited in its effect to "cities of the first class". There was no power conferred upon such cities to reorganize county governments even though city and county were territorially coextensive. This was consistent with article XV, sec. 1, of the Constitution (the Home Rule Amendment), which applied only to cities and not to counties.

On November 6, 1951, the voters of the Commonwealth adopted the constitutional amendment (the so-called City-County Consolidation Amendment), which appears at page 2139 of the Acts of 1949. This amendment has become article XIV, sec. 8 of the Constitution.

The first six subsections of the Consolidation Amendment abolished all county offices in Philadelphia, provided that thenceforth all county functions should be performed by the city through officers selected in such manner as may be provided by law; that all laws applicable to the County of Philadelphia should apply to the city; that the city should take over all powers, property, obligations and indebtedness of the county; that the provisions of article XV, sec. 1, of the Constitution should "apply with full force and effect to the functions of the county government, hereafter to be performed by the city government", and that the amendment should take effect immediately upon its adoption.

Subsection (7) is as follows:

"(7) Upon adoption of this amendment all county officers shall become officers of the city of Philadelphia, and, *until the General Assembly shall otherwise provide,* shall continue to perform their duties and be elected, appointed, compensated and organized in such manner as may be provided by the provisions of this Constitution and the laws of the Commonwealth in effect at the time this amendment becomes effective, but such officers serving when this amendment be-

comes effective shall be permitted to complete their terms."

There then ensued a course of litigation to determine the impact of the above enactments upon the personnel of the former county offices. In Carrow v. Philadelphia, 371 Pa. 255 (1952), *with the city contending otherwise*, it was held that section A-104 of the charter applied to the sheriff's office, a former county office, and that the sheriff could not dismiss an employe without cause. Immediately thereafter, the civil service commission, on July 2, 1952, adopted an amendment to the civil service regulations designed to bring employes of all former county offices within the framework of the city's civil service system and steps were taken to apply other provisions of the charter to such employes.

There followed a series of actions by all of the former county officers to determine the applicability of the charter provisions to them and their employes. All of these actions were transferred to this court and were disposed of in a series of opinions which we shall refer to hereafter. Appeals in all cases were taken to the Supreme Court and were consolidated and disposed of in one opinion, Lennox v. Clark, supra. Both this court and the Supreme Court held, inter alia, in brief, that clauses 1 and 7 of the City-County Consolidation Amendment were self-executing and that on November 6, 1951, when the amendment was adopted, all former county officers and their employes automatically thereby became city officers and employes, and that on January 7, 1952, they became subject to certain considered sections of the charter, particularly the civil service and prohibition against political activity provisions; and, finally, it was also held by the Supreme Court (the lower court held otherwise) that the board of revision of taxes and the registration commission were former county offices and therefore their respective officers and employes became

city officers and employes subject to the provisions of the charter.

Following the rendition of the Lennox decision the legislature passed the Act of August 26, 1953, with the two-fold purpose of (a) implementing the City-County Consolidation Amendment by providing for the merger and integration of former county offices and functions into the structure of the city government by city council, and (b) excluding the sheriff, city commissioners, board of revision of taxes and the registration commission from the operation of the charter.

The title of this act is as follows:

"An Act to carry out the intent and purpose of Article XV, Section 1 and Article XIV, Section 8 of the Constitution of Pennsylvania, and to supplement the First Class City Home Rule Act, approved April twenty-one, one thousand nine hundred forty-nine (Pamphlet Laws 665), by vesting in the Council of the City of Philadelphia full powers to legislate with respect to the election, appointment, compensation, organization, abolition, merger, consolidation, powers, functions and duties of certain officers, offices, boards and commissions of the City of Philadelphia; providing that such officers may be made appointive or abolished; altering the term of the District Attorney of Philadelphia; and establishing the status of the Sheriff, City Commissioners, Board of Revision of Taxes and Registration Commission, the members of such board and commission, and the subordinates and employes of such officers, board and commission."

In the Home Rule Act of April 21, 1949, P. L. 665, the legislature had attempted, inter alia, to exclude the board of revision of taxes and registration commission from the operation of the charter by providing in section 18 of the Home Rule Act as follows:

"Notwithstanding the grant of powers contained in this act, no city shall exercise powers contrary to,

or in limitation or enlargement of, powers granted by acts of the General Assembly which are—(a) Applicable to a class or classes of cities on the following subjects: . . . (7) providing for the personal registration of electors. . . . (9) Providing for the assessment of real or personal property and persons for taxation purposes. . . ."

In the majority opinion of the Supreme Court in the Lennox case it was held (pp. 376-78) that "What was obviously intended by" these provisions was that "the city should not have the power to legislate in regard to the substantive rules governing the making of assessments and valuations of property" or "amend or nullify the general laws of the State regarding the qualifications which entitle an elector to be registered", that is to say, the act meant merely laws concerning "not the personnel" of these offices but the "functions and duties they perform—laws in force throughout the Commonwealth".

Section 1 of the Act of August 26, 1953, P. L. 1476, provides as follows:

"Declaration of Purpose.

"The purpose of this act is to carry out the intent and purpose of Article XV, Section 1 of the Constitution of Pennsylvania, known as the 'Home Rule Amendment,' and Article XIV, Section 8 of the Constitution of Pennsylvania, known as the 'City-County Consolidation Amendment,' by enabling the Council of the City of Philadelphia to abolish or provide for the appointment of certain. elective officers to abolish certain offices, boards and commissions, and pursuant to Section 1-102 (2) of the Philadelphia Home Rule Charter, to integrate and merge within the framework of the government of the City of Philadelphia functions heretofore performed by certain officers, offices, boards or commissions, so that hereafter all of these functions may be carried out by officers, offices, departments, boards or commissions of the City of

Philadelphia under the provisions of the Philadelphia Home Rule Charter adopted by the electorate of the City of Philadelphia on April seventeen, one thousand nine hundred fifty-one, pursuant to the First Class City Home Rule Act of April twenty-one, one thousand nine hundred forty-nine (Pamphlet Laws 665)."

Section 5 of the act, which is the section with which we are concerned, provides as follows:

"Sheriff, City Commissioners, Board of Revision of Taxes and Registration Commission.

"The Sheriff, City Commissioners, the members of the Board of Revision of Taxes and the members of the Registration Commission shall continue to be elected or appointed, organized and compensated, and shall continue to perform all duties and shall have all powers and authority, including, but not limited to, the power and authority to hire and remove employes, as were provided by the Constitution and the acts of Assembly in effect immediately preceding the adoption of Article XIV, Section 8 of the Constitution, and the provisions now or hereafter contained in the Philadelphia Home Rule Charter relating to civil service and prohibiting political activities by officers and employes of the City of Philadelphia shall be inapplicable to the Sheriff, City Commissioners, Board of Revision of Taxes and members thereof and the Registration Commission and members thereof, and the subordinates and employes of such officers, board and commission."

Thus, by the Act of August 26, 1953, the legislature exercised the power conferred upon it by the Home Rule Amendment and by subsection (5) of the Consolidation Amendment. Having the pertinent provisions of the Constitution and laws relating to home rule for cities before us can it be truly said that section 5 of the Act of August 26, 1953, is in conflict with the Home Rule Amendment of the Constitution (article XV, sec. 1) or the City-County Consolidation Amendment (article XIV, sec. 8)? In our opinion it is not.

Insofar as the four former county offices are concerned, there is no question but that the legislature intended to challenge the correctness of or to nullify the effect of the decisions of the Supreme Court in the Carrow and the Lennox cases. The question flatly raised is whether the legislature still had the power to so do. The city variously contends that the decision of the Supreme Court in the Lennox case is to the effect that the former county offices were brought into the structure of the municipal government without any further legislative action; that these offices and their employes were constitutionally fixed within the Home Rule Charter beyond the pale of future legislative consideration or action; that section 5 of the Act of August 26, 1953, as to these four offices seeks to undo the "inter-city-county consolidation" effected by the Consolidation Amendment and to thwart the "intra-city-county consolidation" allegedly contemplated by the charter and authorized by the Home Rule Act and the Consolidation Amendment; that the legislature has, in the Home Rule Act, already granted to Philadelphia "complete powers of legislation and administration in relation to its municipal functions . . . to the full extent that the General Assembly may legislate in reference thereto . . ." and that once the legislature has granted home rule power under article XV, sec. 1, of the Constitution, it cannot thereafter interfere with the exercise of such powers.

The real question presented is whether or not the State Legislature having once granted home rule powers pursuant to the Constitution can reclaim such powers or any portion of them; whether the legislature may further legislate on matters otherwise within the scope of home rule. On this question it should be obvious that neither the Carrow nor Lennox decisions are controlling. Those cases essentially dealt with the effect of the First Class City Home Rule Enabling Act and the Consolidation Amendment; this case requires

a construction of article XV, sec. 1 of the Constitution (the Home Rule Amendment of 1922).

We consider it to be clear that there is no bona fide basis for assuming that the legislature has surrendered permanently its right to control the government of Philadelphia or that it has the constitutional authority to do so. The contention that the legislature, the repository of legislative power under the Constitution, having exercised its power to enact a law, can never thereafter amend, supplement, modify or repeal it, is startling and contrary to our general concepts of legislative power. It is authoritatively settled in our constitutional law [3] that legislative power is to be exercised by the legislative body of the government. The presumption is and must be against any abandonment of this principle in the absence of an intention clearly expressed to the contrary in our fundamental or organic law.

*Article XV, sec. 1, of the Constitution is the fountain from which home rule flows.* Pursuant to article XV, sec. 1, the legislature passed the Home Rule Act in 1949. We shall quote what we regard as the pertinent sections. Section 11 (53 PS §3421.11) provides, inter alia, as follows:

"Any new charter or amendments to the charter of a city thus proposed, which are approved by a majority of the qualified electors voting thereon, shall become the organic law of the city at such time as may be fixed therein and all courts shall take judicial notice thereof. So far as the same are consistent with the grant of powers and the limitations, restrictions and regulations hereinafter prescribed, they shall supersede any existing charter and all acts or parts of acts, local, special, or general, affecting the organization,

---

[3] See article II, sec. 1, Pennsylvania Constitution:

"The legislative power of this Commonwealth shall be vested in a General Assembly which shall consist of a Senate and House of Representatives": Field v. Clark, 143 U. S. 649 (1892); Locke's Appeal, 72 Pa. 491 (1873).

government and powers of such city, to the extent that they are inconsistent or in conflict therewith. All existing acts or parts of acts and ordinances affecting the organization, government and powers of the city, not inconsistent or in conflict with the organic law so adopted shall remain in full force."

Section 17 of the Home Rule Act (53 PS §3421.17) provides as follows:

"Subject to the limitations hereinafter prescribed, the City taking advantage of this act and framing and adopting or amending its charter thereunder shall have and may exercise all powers and authority of *local self-government* and shall have complete powers of legislation and administration in relation to its *municipal functions*, including the power and authority to prescribe the elective city officers, who shall be nominated and elected only in the manner provided by, and in accordance with, the provisions of the Pennsylvania Election Code and its amendments, for the nomination and election of municipal officers. The charter of any city adopted or amended in accordance with this act *may provide for a form or system of municipal government* and for the exercise of any and all powers relating to its *municipal functions*, not inconsistent with the Constitution of the United States or of this Commonwealth, to the full extent that the General Assembly may legislate in reference thereto as to cities of the first class, and with like effect, and the city may enact ordinances, rules and regulations necessary and proper for carrying into execution the foregoing powers and all other powers vested in the city by the charter it adopts or by this or any other law. Ordinances, rules and regulations adopted under the authority of this act or under the provisions of any charter adopted or amended hereunder shall be enforceable by the imposition of fines, forfeitures and penalties, not exceeding three hundred dollars ($300), and by imprisonment for a period not exceeding ninety days."

If, as the city contends, there has been effected the remarkable result of autonomy in local affairs in Philadelphia, insulated from interference by the General Assembly, how has it come about? Certainly there is nothing in the language of the Amendment of 1922 or the Act of 1949 to sustain such result. Insofar as the Home Rule Act is concerned, it is an act of the legislature and no legislature has the power or authority to permanently surrender governmental powers on behalf of its successors. *If a permanent surrender of power is to be found it must be traceable to the Constitution.* This the city recognizes in its argument and it therefore contends that article XV, sec. 1, should be regarded as constituting the legislature a donee of a power of appointment, viz., to grant home rule; that after such power is once exercised there is no further authority in the legislature. Much of the city's brief is addressed to questions of desirability, to which subject we shall hereafter refer; but in recognizing the necessity for finding constitutional authority the following appears in its brief:

"The constitutional provision (article XV, section 1) does not authorize the legislature to add restrictions and limitations on local home rule *'from time to time'*. It authorizes such restrictions and limitations to be imposed by the legislature in granting home rule. Once the grant has been exercised and accepted by the electors of the locality, the legislature has executed the constitutional mandate and the people of the local community enjoy home rule. They enjoy it not because the legislature has granted it; for the grant comes from the Constitution. The legislature is the constitutional instrumentality for making the factual finding or determination as to which city or cities in the Commonwealth, at the particular time, should enjoy home rule, and the extent to which limitations should be imposed upon the grant.

"Moreover, even if the legislature could at any time —or 'from time to time'—impose limitations, they could not be limitations contrary to the home rule which is part of the constitutional grant, i.e., matters clearly of local self-government."

We cannot accept this assumption that by the Home Rule Act the legislature was merely executing a constitutional mandate. This theory offered by the city is essentially an invitation for this court to sit as a constitutional convention. Article XV, sec. 1, confers a discretion upon the legislature to grant or withhold home rule; it grants no power or authority to any city. If the 1922 amendment were written "City or cities of any particular class, *shall have* the right and power to frame and adopt their own charter and to exercise the power and authority of local self-government when authorized by the Legislature" then it might be contended that the city derived its home rule from the Constitution, but the amendment as actually written provides that such powers "may be given" by the legislature and "subject, however, to such restrictions, limitations, and regulations as may be imposed by the Legislature."

The parties have ignored the settled governmental concept or principle in this Commonwealth that a municipal corporation is simply an agency and creature of the State which has been invested with certain subordinate governmental functions for reasons of convenience and public policy; that such functions may be changed or repealed whenever the legislature so wills and that not only its powers but also its form and indeed its very continued existence is subject to legislative discretion. To this effect have spoken two of the most distinguished jurists in the Commonwealth's history on behalf of the Supreme Court. In Philadelphia v. Fox et al., 64 Pa. 169, 180 (1870), Mr. Justice Sharswood stated:

"The City of Philadelphia is beyond all question a municipal corporation, that is, a public corporation created by the government for political purposes, and having subordinate and local powers of legislation: 2 Kent's Com. 275; an incorporation of persons, inhabitants of a particular place, or connected with a particular district, enabling them to conduct its local civil government; Glover Mun. Corp. 1. It is merely an agency instituted by the sovereign for the purpose of carrying out in detail the objects of the government—essentially a revocable agency—having no vested right to any of its powers or franchises—the charter or act of erection being in no sense a contract with the state—and therefore fully subject to the control of the legislature, who may enlarge or diminish its territorial extent or its functions, may change or modify its internal arrangement, or destroy its very existence, with the mere breath of arbitrary discretion. . . ."

In Commonwealth v. Moir, 199 Pa. 534, 541 (1901), Mr. Justice Mitchell stated:

"Municipal corporations are agents of the State, invested with certain subordinate governmental functions for reasons of convenience and public policy. They are created, governed, and the extent of their powers determined by the legislature, and subject to change, repeal, or total abolition at its will. They have no vested rights in their offices, their charters, their corporate powers, or even their corporate existence. This is the universal rule of constitutional law, and in no state has it been more clearly expressed and more uniformly applied than in Pennsylvania."

In the Moir case the court had under consideration the so-called "Pittsburgh Ripper Bill" (Act of March 7, 1901, P. L. 20, 53 PS §8381 et seq.) which completely revised the structure of cities of the second class including Pittsburgh, Allegheny and Scranton, provided for removal of officers then in office and replaced them temporarily with gubernatorial appointees. The court

sustained the act despite then strong public opposition.

The powers of a municipality by the familiar rule, sometimes characterized as Dillon's rule, are to be strictly construed: Valley Deposit and Trust Company of Belle Vernon, 311 Pa. 495 (1933); Wentz v. Philadelphia, 301 Pa. 261 (1930); American Aniline Products, Inc., v. Lock Haven, 288 Pa. 420, 423 (1927); Lesley v. Kite, 192 Pa. 268, 274 (1899); Appeal of Whelen, 108 Pa. 162, 197 (1884); Pittsburgh Railways Co. v. Public Service Commission, 115 Pa. Superior Ct. 58, 65, 66 (1934); Dillon, Municipal Corporations (5th ed., 1911), sec. 237. In Lesley v. Kite, supra, the rule was stated as follows:

"Nothing is better settled than that a municipal corporation does not possess and cannot exercise any other than the following powers: (1) those granted in express words; (2) those necessarily or fairly implied in or incident to the powers expressly granted; (3) those essential to the declared objects and purposes of the corporation, not simply convenient but indispensable. Any fair, reasonable doubt as to the existence of power is resolved by the courts against its existence in the corporation, and therefore denied: Dillon on Municipal Corporations, Sec. 89."

*Bearing in mind that we are now considering not only the powers of a municipality, but its powers as competitively contrasted or opposed to legislative power, the rule of construction must be stringently in favor of the General Assembly.*

Article XV, sec. 1, of the Constitution provides for the exercise of city home rule powers "subject, however, to such restrictions, limitations, and regulations, as may be imposed by the Legislature." Clause 5 of the City-County Consolidation Amendment by reference to article XV, sec. 1, provides that the legislature may grant county home rule powers; it adds nothing to the question of when or what restrictions, limita-

tions and regulations may be imposed by the legislature. Defendants have taken the position that such restrictions, limitations and regulations may be but once initially imposed; that the City-County Consolidation Amendment being self-executing, the county offices automatically became city offices in a transition wholly achieved by the constitutional amendment; that these offices and their employes became immediately subject to the charter which had already been adopted pursuant to the enabling Home Rule Act of 1949. It should be made absolutely clear that there is no question but that the four offices here involved are now city offices; that their employes, whether subject to the charter or not, are city employes as held in the Carrow and Lennox cases—any other alternative was foreclosed by the decision of the Supreme Court which is the final and definitive authority on the meaning of the Constitution. Neither the executive nor the legislative branches of government can change the meaning of the Constitution after that court has spoken and every court in this Commonwealth is duty bound to apply such decisions, when pertinent, to all matters which come before them. But the issue here presented is not whether the legislature may alter a constitutional interpretation by the Supreme Court, but rather whether under that interpretation the legislature has the reserved power to further determine what home rule powers the city shall continue to exercise pursuant to its original legislative mandate.

If we accepted defendant's contention that restrictions, limitations and regulations on home rule power could be but once and only initially imposed, we should thereby charge the legislature that it had to guess at its peril what restrictions to impose; that error, if made, was irretrievable; that not experience but conjectured foresight was to be the sole basis for its legislation.

Plaintiffs persist in a contention that home rule charter provisions must yield to legislative action on matters of *State-wide* concern; that their offices deal with matters of State-wide concern; that their duties are principally derived from legislation with uniform application and therefore the legislature may regulate the selection and activities of their personnel. This is needlessly confusing and we specifically reject such contention as forming any basis of our decision. The Lennox and Carrow cases have already sufficiently held that the selection and regulation of the personnel of city offices comes within the concept of municipal functions. The question is whether the legislature can amend its enabling act whereby home rule is authorized, regardless of whether such amendment effectively deals with municipal functions or matters of State-wide concern. The city, indeed, contends that after the passage of the Home Rule Act, it is *only* as to matters of State-wide concern that the legislature may act, aside from the limitations and restrictions originally imposed. But it is clear from the language of article XV, sec. 1, that the restrictions, limitations and regulations to be imposed by the legislature were to be precisely in the field of local concern and municipal functions. The constitutional provision only authorizes the legislature to grant to the city the right "to exercise the powers and authority of *local self-government*" and in no event with regard to matters of State-wide concern. Therefore the restrictions, limitations and regulations contemplated by the Constitution must refer to matters of local self-government. What restrictions, limitations and regulations should be imposed is most certainly a matter to be determined from events and experience—not a matter for a single prophecy at the time of enabling the adoption of a charter.

If further evidence of the constitutional recognition of the retained power of the legislature over local affairs, as well as matters of State-wide concern, is

necessary, one may regard subsection 2 of the Consolidation Amendment, which explicity authorizes the General Assembly to enact *local and special laws* for the regulation of the affairs of the city and the creation of offices or prescription of the power and duties of officers. The Act of August 26, 1953, is precisely such a local law which, inter alia, regulates the affairs of the city with regard to four offices and prescribes the powers of the named officers by continuing their theretofore unchallenged power with respect to selection and removal of their employes. The constitutional language is clear and free from ambiguity in bestowing power on the legislature and the presumption of constitutionality is too familiar to require extensive citation.[4] In such circumstances, as Chief Justice Horace Stern stated in both the Carrow and Lennox cases, we must read the enactment "with an eye to [its] plain and unequivocal meaning instead of with a straining after forced constructions and a seeking of ambiguities." With the motives of the legislature we are totally unconcerned; as to the wisdom of the legislature we are without right or power of judgment —as the judicial branch in a most real sense determines the scope of its own power, its essential attribute, in order to preserve the principle of separation of powers, must be a keenly developed sense of self-restraint.

Counsel for the board of revision of taxes and the registration commission have undertaken in their

---

[4] Section 51 of the Statutory Construction Act of May 28, 1937, P. L. 1019, 46 PS §501 et seq., states:

"When the words of a law [and Constitution] are clear and free of ambiguity, the letter of the law is not to be disregarded under the pretext of pressing its spirit."

See also Caminetti v. United States, 242 U. S. 470, 37 S. Ct. 192, 61 L. Ed. 442 (1917); Commonwealth v. Sunray Drug Company, 360 Pa. 230 (1948); Commonwealth ex rel. Cartwright v. Cartwright et al., 350 Pa. 638 (1945); Kusza v. Maximonis et al., 363 Pa. 479 (1950).

brief, in effect to reargue the Lennox case and flatly contend that the members of the board of revision of taxes and the registration commission were not and are not county officers. We, of course, cannot undertake to review the correctness of so recent an appellate decision. However, in addressing ourselves to matters of grave constitutional significance, we are of the opinion that we owe to the people of the city and of the Commonwealth, as well as the Supreme Court of the Commonwealth, a most frank and candid statement of our views.

In the Carrow case the Supreme Court held that the personnel and civil service provisions of the Home Rule Charter applied to a former county employe in the sheriff's office. Thereafter the crucial question arose in the Lennox case as to what then constituted these county offices which were encompassed by the Home Rule Act of 1949 as a result of the city-county consolidation in 1951. This court held, as the lower court in that case, that the board of revision of taxes and the registration commission were not county offices within the framework of the amendment; that the integration of such offices was a matter for legislative decision. The Supreme Court ruled otherwise. We are of the unaltered opinion that the Lennox case, insofar as it pertained to the board and commission, was correctly decided by this court; that the successful effort of the city, aided by the decision of the Supreme Court, represented personal conceptions of good government or reform more appropriately to be regarded as a function of the legislature rather than the courts. Mr. Justice Bell and Mr. Justice Musmanno, in vigorous dissenting opinions quite properly pointed out that the court in that portion of its decision was engaged in the legislative, not the judicial, process.

In the Lennox case, in our opinions for the lower court, we carefully and extensively pointed out the distinction between "city" home rule and "county"

home rule and set forth our views to the effect that the First Class *City* Home Rule Act was not to be regarded as the enabling legislation for a Philadelphia *County* Home Rule Charter. This was regarded as doubly important in view of the fact that the Home Rule Act was enacted in 1949 before county home rule was even made possible by approval of the Consolidation Amendment in 1951.

Faced, however, with the decision in the Carrow case it was necessary to reconcile our views as to the absence of county home rule with the power of the city to legislate with regard to personnel. We carefully drew a distinction between county functions and municipal functions and held that the personnel provisions of the charter were proper enactments with regard to municipal functions and that former county employes were subject to such provisions.

The Supreme Court, in its majority opinion by Mr. Chief Justice Horace Stern, accepted the crucial distinction we drew between municipal and county functions, characterizing the same distinction as "between the effect of the consolidation on the *personnel* of the county offices and its effect on the *duties* or *functions* performed by such offices." This distinction was also characterized as a distinction between *inter*-city-county consolidation whereby the former county officers and their employes became city officers and employes and as such bound by pertinent charter provisions and *intra*-city-consolidation dealing with the reorganization of the activities or functions of the former county offices. The court, quite properly, since the question was not before it, did not pass upon the question of how county home rule was to be achieved, but stated (page 370) :

"Since clause (7) of the City-County Consolidation Amendment provides that the county officers are to continue, now as city officers, to perform their duties 'until the General Assembly shall otherwise provide,'

it would seem that any proposed reorganizations, regroupings, abolitions, or mergers, of the former county offices, designed the more advantageously to incorporate their functions into the existing municipal structure, must wait upon action by the General Assembly. Whether, however, the legislature has already abrogated its power in that regard and vested it exclusively in the city by the provisions of Article II, section 17, of the Home Rule Act or otherwise, is a question not involved in the present appeals, and as to which, therefore, we express no opinion." [5]

---

[5] Defendants in their brief state:

". . . we earnestly submit that the mandate to carry out 'intra-city-county consolidation' belongs under clause 7 to our local legislative body, i.e. the council, and not the State legislature" and "The council under home rule is the equivalent of the 'General Assembly' and therefore is alone authorized to act under clause 7."

Even conceding that the legislature did grant such power to city council, which we do *not*, by the Act of August 26, 1953, it emphatically took such power away, which it had the right to do, as we have amply demonstrated. However, it should be clearly understood that the use of the term "intra" refers to county *functions*. In our opinion for the lower court in the case of Lennox v. Clark, supra, we set forth at length our view that the legislature did not by the Home Rule Act grant home rule on the subject of county functions before it constitutionally even had the power to do so. We stated:

"The consequences of an assumption that the Home Rule Act is a county as well as a First Class City Home Rule Act are staggering—not because such a transfer of power may not be desirable but rather because, as our research into the history of the Home Rule Act indicates, such blanket results received no consideration from the legislature. What powers exercised by the legislature are now to be exercised by the city? A consideration of title 16 devoted by Purdon's Annotations to the subject of counties and the numerous examples in the briefs and pleadings of the parties plaintiff in all six cases before us, will indicate the haphazard scope of such a supposed grant of county home rule. If, as we have indicated, county functions are created 'with a view to the policy of the State at large', can it be concluded that the legislature has already surrendered its legislative powers on such subject? The City-County Consolidation Amendment was a forecast of future legislation but we cannot accept the conclusion or result that it was intended to authorize, in effect, a secession of Philadelphia from the Commonwealth."

We incorporate herein, by reference thereto, our opinions for the lower court in Lennox v. Clark, supra.

Following the decision in the Lennox case, and the subjection of the board of revision of taxes and the registration commission to the charter's personnel provisions, the legislature was confronted with a judicially devised result which it had not contemplated and which not even the proponents of the charter had contemplated: see dissents of Mr. Justice Bell and Mr. Justice Musmanno in the Lennox case. The legislature thereupon proceeded to undo in part what the courts had done.[6] By the Act of August 26, 1953, the legislature purports to authorize the streamlining, i.e., intra-city-consolidation, of Philadelphia's municipal governmental structure in regard to certain offices; but, as to the four offices we are considering not only has the legislature refused to authorize their integration and merger into the existing municipal structure but it has removed them to the extent that the judiciary theretofore declared that they were so integrated personnel-wise.

Even if we were to hold that the board of revision of taxes and the registration commission were not county offices, which we are certainly unwilling to do

[6] Defendants contend that section 5 of Act No. 433 is an attempt by legislative act to repeal a constitutional provision (Consolidation Amendment), which cannot be done directly or indirectly. It should be eminently clear, however, that the Consolidation Amendment qua consolidation is quite unaffected. The former county offices and their personnel are now city offices and city personnel beyond recall. The question is one of retained legislative power in declaring how and by whom municipal powers are to be exercised. In the Lennox case Chief Justice Stern stated (page 366) of the effect of the Consolidation Amendment:

"Its real and designed result was that, when the former county officers became city officers and the former county employes city employes, they automatically became subject thereby to the laws then in effect governing and regulating city officers and employees, and also, of course, to any such laws as might thereafter become effective."

The legislature has firmly changed the laws to which certain personnel were subject. We are considering the validity of a law *thereafter* effective. We emphasize our lack of power to pass upon the wisdom of such law.

in view of the decision to the contrary in the Lennox case, we could not avoid passing upon the constitutional question of legislative power because the legislature has also withdrawn the sheriff and the city commissioners and their personnel from charter coverage. Whether the legislature would have withdrawn these latter offices from charter coverage, in the due course of political process, had the board of revision and the registration commission been excluded, is a question of conjecture addressed to students of the effect of judicial efforts to legislate conceived reforms.

The result we are called upon to declare is that in 1949, before the City-County Consolidation Amendment was passed the legislature was prescribing by general law the "limitations, restrictions and regulations" which it would propose in the event county home rule were adopted in the future; that the Act of 1949 represented the seeds of permanent surrender of power by the State to the City in the field of county functions! That result cannot be accepted if for no other reason than the excellent one that it was not so considered and discussed and when considered it was quite properly deemed a problem in futuro.

The grant of home rule power as to county offices and county personnel under article XV (Home Rule Amendment) by reference thereto of section 8, subsec. 5, of the Consolidation Amendment, was to be made subject to restrictions, limitations and regulations imposed by the legislature. Clause 7 of article XIV, sec. 8, of the Consolidation Amendment, provided that the former county officers would "continue to perform their duties and be elected, appointed, compensated and organized in such manner as may be provided by the provisions of this Constitution and the laws of the Commonwealth in effect at the time this Amendment becomes effective" "*until the General Assembly shall otherwise provide.*"

It is one thing to hold that existing law, passed prior to the amendment enabling county home rule, is applicable to such officers and employes, and it is quite another to hold that the preëxisting legislation represents the legislature's sole right of expression on a subject to arise in the future. The only legislative body which could pass upon the scope of county home rule was the General Assembly of 1953. The legislatures of 1949 and 1951 had already passed into history. The words "until the General Assembly shall otherwise provide" were sheer surplusage if it is to be held that the legislature had already so irretrievably provided in 1949. This court is unwilling to usurp the functions of a constitutional convention and write into the Constitution a provision with regard to home rule which has not received most careful consideration and study of our total constitutional and governmental structure.

Controversies have arisen in regard to the scope of municipal home rule in various forms in other States and both sides in this matter have referred us to cases from other jurisdictions. An examination of these and other cases and the constitutional history of each particular jurisdiction indicates that, in general, where the home rule power is conferred *directly and constitutionally* upon the municipality it has sometimes been held that such charters are beyond the power of the legislature to repeal or amend; but where the charter is conferred *mediately* as a result of legislative action or is broadly subjected to legislative action, such charter is subject to both repeal and amendment by legislative action. From our review of the law in our sister States, limited by the time we may devote to such project in view of the alleged urgency of a final disposition of this matter, it appears that cases referred to in other jurisdictions must be most cautiously considered with regard to their particular total State governmental and constitutional scheme.

A consideration of the Oregon constitution and some of the cases arising thereunder is of value. In Straw v. Harris, 54 Oregon 424 (1909), the Supreme Court of Oregon had under consideration a statute which, inter alia, took away from a municipality control of its wharves and docks within the city, though its municipal charter purported to cover such subject matter. Article XI, sec. 2, of the Oregon constitution originally pertinently provided as follows: "Corporations may be formed under general laws, but shall not be created by special laws, except for municipal purposes." This provision was amended on June 4, 1906, to pertinently read as follows: "Corporations may be formed under general laws, but shall not be created by special laws, except for municipal purposes." This provision was amended on June 4, 1906, to pertinently read as follows: "Corporations may be formed under general laws, but shall not be created by the legislative assembly by special laws." Under Oregon law the term "corporation" encompassed municipal corporations. In the Straw case the court held that the statute was valid though it encroached upon the conduct of municipal affairs. The court (after reciting that all reasonable doubts are to be resolved in favor of the validity of a legislative act; that it was not for the court to say whether legislation is wise or unwise, reasonable or unreasonable, just or unjust; that courts look only to the constitutional power of the legislature and not to the effect of the exercise of such power) stated:

"True, the language used in the amendments considered would appear to give to incorporated cities the exclusive control and management of their own affairs, even to the extent, if desired, of legislating within their borders without limit, to the exclusion of the State. But, as stated these provisions must be construed in connection with others of our fundamental laws, which can but lead to the conclusion above announced; and whatever may be the literal import of the amendments

it cannot be held that the State has surrendered its sovereignty to the municipalities to the extent that it must be deemed to have perpetually lost control over' them. This no state can do. The logical sequence of a judicial interpretation to such effect would amount to a recognition of a state's independent right of dissolution. It would but lead to sovereigntial suicide. It would result in the creation of states within the state, and eventually in the surrender of all state sovereignty—all of which is expressly inhibited by Article IV, section 3 of our national constitution. Power to enact local legislation may be delegated, but this of necessity, whether stated or not, is always limited to matters consonant with, and germane to, the general purpose and object of the municipalities to which such prerogatives may be granted.

"Municipalities are but mere departments or agencies of the State, charged with the performance of duties for and on its behalf, and subject always to its control. The State, therefore, regardless of any declarations in its constitution to the contrary, may at any time revise, amend or even repeal any or all of the charters within it, subject, of course, to vested rights and limitations otherwise provided by our fundamental laws. This under the constitution as it now stands, may be done by the Legislature through general laws only, and the same authority may be invoked by the people through the initiative by either general or special enactments; only the legislature being inhibited from adopting the latter method."

The people of Oregon thereupon promptly, by initiative petition filed June 23, 1910, and adopted on November 8, 1910, effective December 3, 1910, amended their constitution to read as follows:

"Corporations may be formed under general laws, but shall not be created by the legislative assembly special laws. The legislative assembly shall not enact, amend or repeal any charter or act of incorporation

for any municipality, city or town. The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the constitution and criminal laws of the State of Oregon . . ."

Then in Branch v. Albee, 71 Oregon 188 (1914), and Kalich v. Knapp, 73 Oregon 558 (1914), rehearing 73 Oregon 570 (1914), it was emphatically held that the legislature could not amend the charter of a municipal corporation by special or general act; that the legislature was without power to legislate as to local or municipal matters. The court disapproved language in the Straw case to the effect that such result could not be accomplished. See also City of Portland v. Nottingham, 58 Oregon 1 (1911); Thurber v. McMinnville, 63 Oregon 410 (1912); State ex rel. v. Portland, 65 Oregon 273 (1913); Pearce v. Roseburg, 77 Oregon 195 (1915); Burton v. Gibbons, 148 Oregon 370 (1934); City of Portland v. Welch, 154 Oregon 286 (1936); as to county home rule in Oregon see James D. Barnett, A County Home Rule Constitutional Amendment (1929), 8 Oregon L. Rev. 343, and as to municipal home rule see John P. Ronchetto and Wayne Woodmansee, Home Rule in Oregon (1939), 18 Oregon L. Rev. 216, wherein it was stated (page 217 f. n. 4) that "The legal effect of Art. IV, Sec. 1a [initiative and referendum] is so interwoven with that of Art. XI, sec. 2, that consideration of one without the other is impossible"; Montague, Law of Municipal Home Rule in Oregon (1920), 8 Calif. L. Rev. 151.

Of the foregoing Oregon cases it is sufficient to observe that our Constitution is certainly not framed in the language of the 1910 Oregon constitutional amendment; that our Constitution does not confer home rule powers directly upon municipalities. The phrasing of article XV, sec. 1, must be deemed to have been deliberate and is particularly significant in view of the constitutional language employed in the constitutions of

sister States. The Home Rule Amendment was not adopted in Pennsylvania until after numerous States had already undertaken to alter their constitutions. We are appending hereto as appendix A a limited reference to constitutional provisions which directly lodge home rule powers in municipalities and some of the cases which have arisen in such jurisdictions.

In Dry v. Davidson, 115 S. W. 2d 689 (Ct. of Civ. App. of Texas, 1938), the court considered article 11, sec. 5, of the Texas Constitution, which provided as follows:

"Cities having more than five thousand (5000) inhabitants may, by a majority vote of the qualified voters of said city, at an election held for that purpose, adopt or amend their charters, subject to such limitations as may be prescribed by the Legislature, and providing that no charter or any ordinance passed under said charter shall contain any provision inconsistent with the Constitution of the State, or of the general laws enacted by the Legislature of this State . . ."

In that case the legislature by an act applicable to a class of cities fixed the minimum salaries of firemen. Plaintiff sued to recover the amount of his legislative raise and the court sustained the validity of the statute. The court stated:

". . . this phrase 'as *may* be prescribed,' can only mean that future legislation may also limit whatever action a city may take, as well as that existing at the time it first takes out or amends its charter."

The court referred to Hunt v. Atkinson, 18 S. W. 2d 594, and quoted the following with approval (at pages 691-92):

"The point now made is that, since the adoption of the home rule amendment to the Constitution (article 11, sec. 5), the Legislature is without power to grant a charter to a city such as Houston, and that therefore it has no power to do indirectly that which it cannot

do directly, to wit, pass a law validating the boundaries of the city established in a way confessedly bad at the time. . . . Now, article 1165 (the enabling act of the Home Rule Amendment) of the Revised Statutes 1925, declares, with reference to the right of the people of a municipality to select their charter, that the same shall be *'subject to such limitations as may be prescribed by the Legislature,'* and *shall contain nothing 'inconsistent with the Constitution or general laws of this State.'* If the last clause by way of limitation stood alone, it might with great force be argued that home rule cities possess exclusive power superior to that of the Legislature with respect to all municipal matters not inconsistent with the Constitution, since the term 'general laws' might be construed to mean laws of the state other than municipal laws. There is excellent authority elsewhere throughout the country for this contention. But this is not the sole limitation imposed upon the municipality. Their charters must be *'subject to such limitations as may be prescribed by the Legislature.' This clearly shows that the legislative power is in all things supreme; that the power of the municipality is subject in all respects to 'such limitations' as may be prescribed by the Legislature, without distinction as to those limitations then existing or arising through subsequent legislative enactments.* We take it to be that the power of the municipality of home rule cities is not supreme in matters of legislation, but is at all times subject to any and all limitations that may be prescribed by the Legislature."

Finally it was significantly stated:

". . . appellee's contrary contention . . . simply amounts to an attempt to engraft upon the express limitation in the Home Rule Amendment, 'subject to such limitations as may be prescribed by the Legislature,' a further one to the effect, 'No such act of the

Legislature shall deal with purely local or municipal affairs'; whereas, the only limitation placed by the people in ordaining that amendment upon the Legislature in the regulation of cities coming under its protection is that it must be done by general law."

See also City of Fort Worth v. Fire Department of City of Fort Worth, 213 S. W. 2d 347 (Ct. of Civ. App. of Texas, 1948).

Not only is the language of the foregoing Texas cases pertinent to the question involved here but such language applies with even greater force since our Constitution does not purport to *directly* confer any home rule powers on municipalities.

The city has devoted a considerable aspect of its brief and oral argument to questions of the desirability or undesirability of section 5 of the Act of August 26, 1953. It contends that section 5 is a legislative attempt "to escape the provisions of the City-County Consolidation Amendment and the Home Rule Charter"; that the will of the people is being "undermined without their consent"; that unless the legislature is prevented from interfering in Philadelphia's local matters the grant of home rule is an illusion.

We have heretofore stated that it is no part of our function to pass on the wisdom or motives of the legislature; nor do we have the power or right to pass on the question of desirability of legislation. And we are acutely conscious of the fact that the "will of the people" is much more sensitively and expeditiously expressed and realized through the legislative rather than the judicial process. When legislatures thwart or undermine the will of the people the democratic process provides comparatively prompt access to the ballot box which is the instrument of correction of and reversal of legislatures. We certainly cannot assume that the legislature will defeat home rule for Philadelphia.

Finally, it is not nearly so clear to what extent it is desirable to constitutionally remit local government to municipalities beyond the future control of the Commonwealth. We do not make this reference with any intention of debating issues of desirability, but solely to point out that the scope of change to be wrought is a matter for most serious consideration. We have already demonstrated that, aside from desirability, it does not appear that the people of the Commonwealth intended a sharp break with our past concept of local-State governmental relations as enunciated by Justices Sharswood and Mitchell in the cases above quoted. The city has referred to McBain, The Law and the Practice of Municipal Home Rule (1916),[7] and Report of the Commission to Devise a Plan for the Government of the Cities of New York State, 1877, as though the issue before us concerned the advisability of providing for home rule. Of course, we are not concerned with such problem but rather with the scope of the home rule which has been granted. We are of the opinion that it was never intended to, and article XV, sec. 1, of the Home Rule Amendment, did not confer upon Pennsylvania's cities constitutional municipal home rule,[8] and certainly conferred no constitutional

---

[7] Howard L. McBain's classic work on home rule must be read in conjunction with Joseph D. McGoldrick's Law and Practice of Municipal Home Rule, 1916-1930 (Columbia Univ. Press, 1933) and see also a series of articles on home rule in individual States in National Municipal Review, 1932.

[8] "The power is generally called that of constitutional municipal home rule. It may be defined as the power conferred on cities by the state constitution to make and change their own charters within the limits of law. It is conferred in each state by the constitution, since it is very doubtful whether the legislature of the state could delegate this charter-making power to the cities. In effect this power transfers to the cities themselves the right to enact those special changes in their local laws and charters which the legislature is forbidden to make when special legislation is prohibited . . .": William Anderson, American Government, 3rd ed., page 105 (Henry Holt & Co., 1946).

*county* home rule upon Philadelphia and when such step is taken there can be carefully considered what limitations shall be set forth as to such constitutional grant.[9]

For all of the foregoing reasons we are of the opinion that section 5 of the Act of August 26, 1953, being Act No. 433, is constitutional and a valid exercise of the legislative power of the General Assembly of the Commonwealth of Pennsylvania.

Wherefore we enter the following

### *Declaratory Judgment*

And now, December 1, 1953, upon consideration of the petition of plaintiffs and the answer thereto of defendants, the parties hereto having agreed that a full and final hearing has been held herein, it is ordered, adjudged and declared as follows:

That section 5 of Act No. 433 of 1953, being Senate Bill No. 445 and House Bill No. 128, approved by the Governor of the Commonwealth on August 26, 1953, is a constitutional enactment; that section 5 being valid and subsisting it is binding upon all parties plaintiff and parties defendant hereto and they should be governed accordingly.

### APPENDIX A

Article VIII, sec. 21, of the Michigan Constitution, adopted by constitutional convention, February 21, 1908, and ratified by the electors, November 3, 1908, provides:

---

[9] See for example article VIII of the Model State Constitution re local government prepared through the efforts of the National Municipal League, where the limitations on grants of home rule power are carefully considered. The fourth edition of this model appears in the appendix to W. Brooke Graves, American State Government, 3rd ed. (D. C. Heath and Co., Boston, 1946).

"Under such general laws [section 20 states, The legislature shall provide by a general law for the incorporation of cities. . . .], the electors of each city and village shall have power and authority to frame, adopt and amend its charter and to amend an existing charter of the city or village theretofore granted or passed by the legislature for the government of the city or village and, through its regularly constituted authority to pass all laws and ordinances relating to its municipal concerns, subject to the constitution and general laws of this state"; Simpson v. Paddock, 195 Mich. 581 (1917); Harsha v. Detroit, 261 Mich. 586 (1933); Utica State Savings Bank v. Oak Park, 279 Mich. Mich. 568 (1937); Motorcoach Operators' Assn., Inc., v. Detroit, 284 Mich. 321 (1939).

Article XI, sec. 2, of the Nebraska Constitution of 1875, as amended, provides: "Any City having a population of more than five thousand (5,000) inhabitants may frame a charter for its own government, consistent with and subject to the constitution and laws of this state . . ."; State ex rel. Fischer v. City of Lincoln, 137 Neb. 97 (1939).

Article XVIII, sec. 7, of the Ohio Constitution of 1851 (adopted as an amendment on September 3, 1912) provides:

"Any municipality may frame and adopt or amend a charter for its government and may, subject to the provisions of section 3 of this article, exercise thereunder all powers of local self-government."

Section 3 referred to provides:

"Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws": Fitzgerald v. Cleveland, 88 O. S. 338, 103 N. E. 512 (1913); Transport Corp. v. Bridgeport, 44 O. App. 433, 185 N. E. 891, 38 O. L. R. 162, dis-

missed 126 O. S. 238 (1932) ; State ex rel. Hanna v. Spitler, 47 O. App. 114, 190 N. E. 584, 40 O. L. R. 163 (1933) ; State ex rel. City of Toledo v. Cooper, 97 O. S. 86, 119 N. E. 253 (1917).

Article XVIII, sec. 3, of the Oklahoma Constitution provides:

"Any city containing a population of more than two thousand inhabitants may frame a charter for its own government, consistent with and subject to the Constitution and laws of this State . . .": City of Wenoka v. Rodman, 177 Okla. 630 (1935) ; Goodwin v. Oklahoma City, 199 Okla. 26 (1948) ; Ex parte Gammel, 89 Okl. Cr. 400, 208 P. 2d 961 (1949) ; Ex parte Pappe, 88 Okl. Cr. 166, 201 P. 2d 260 (1949) ; Bacon v. Wimmer, 130 Okl. 289, 267 Pac. 261 (1928) ; Sparger v. Harris, 191 Okl. 583, 131 P. 2d 1011 (1943) ; Ex parte Hodges, 65 Okl. 69, 83 P. 2d 201 (1938) ; City of Tulsa v. Sikes, 196 Okl. 306, 164 P. 2d 863 (1946) ; City of Tulsa v. Blair, 194 Okl. 192, 148 P. 2d 165 (1944) ; City of Tulsa v. Lynch, 193 Okl. 505, 145 P. 2d 202 (1944) ; Pitts v. Allen, 138 Okl. 295, 281 Pac. 126 (1929) ; Ramsey v. Leeper, 168 Okl. 43, 31 P. 2d 852 (1934).

See also Arizona Constitution, effective February 14, 1912, art. 13, sec. 2; City of Tucson v. Arizona Alpha of Sigma Alpha Epsilon, 67 Ariz. 330, 195 P. 2d 562 (1948) ; City of Tucson v. Tucson Sunshine Climate Club, 64 Ariz. 1, 164 P. 2d 598 (1945) ; Clayton v. State, 38 Ariz. 135, 297 Pac. 1037 (1931) ; Northeast Rapid Transit Co. v. Phoenix, 41 Ariz. 71, 15 P. 2d 951 (1932) ; Luhrs v. Phoenix, 52 Ariz. 438, 83 P. 2d 283 (1938).

California Constitution, art. XI; Davis v. Los Angeles, 86 Cal. 37 (1890) ; Miller v. Curry, 113 Cal. 644 (1896) ; People v. Williamson, 135 Cal. 415 (1902) ; Schaeffer v. Herman, 172 Cal. 338 (1916).

Colorado Constitution, adopted March 14, 1876, art. XX, sec. 6; Laverty v. Straub, 110 Colo. 311, 134 P. 2d 208 (1943); Denver v. Tihen, 77 Colo. 212, 235 P. 777 (1925); People v. McNichols, 91 Colo. 141, 13 P. 2d 266 (1932); Keefe v. People, 37 Colo. 317, 87 P. 79 (1906); Denver v. Henry, 95 Colo. 582, 38 P. 2d 895 (1934); Denver v. Hallett, 34 Colo. 393, 83 P. 1066 (1905); Sanborn v. City of Boulder, 74 Colo. 358, 221 P. 1077 (1923).

Maryland Constitution, September 18, 1867, art. XIA, secs. 2-7 (amendment added November 1915): Tighe v. Osborne, 149 Md. 360, 131 Atl. 801 (1926).

Minnesota Constitution, art. 4, sec. 36 (Constitution of October 13, 1857, as amended November 3, 1896: November 8, 1898; November 3, 1942); Minneapolis St. Ry. Co. v. City of Minneapolis, 229 Minn. 502, 40 N. W. 2d 353 (1950), appeal dismissed, 339 U. S. 907, 70 S. Ct. 574, 94 L. Ed. 1335; William Anderson, Municipal Home Rule in Minnesota (1923), 7 Minn. L. R. 306.

Missouri Constitution, art. IX (art. 9, sec. 16 of the constitution of 1875, as amended); Kansas City v. Threshing Machine Co., 337 Mo. 913, 87 S. W. 2d 195 (1935); State ex rel. Dwyer v. Nolte, 351 Mo. 271, 172 S. W. 2d 854 (1943); Turner v. Kansas City, 354 Mo. 857, 191 S. W. 2d 612 (1946).

Utah Constitution, effective January 4, 1896, art. XI, sec. V (amendment adopted November 8, 1932); Wadsworth v. Santaquin City, 83 Utah 321, 28 P. 2d 161 (1933).

Washington Constitution, art. XI, sec. 10.

West Virginia Constitution, art. VI, sec. 39(a); Brackman's Inc., v. Huntington, 126 W. Va. 21, 27 S. E. 2d 71 (1943).

See generally 62 C. J. S. §198(c); annotation, Right of municipality to invoke constitutional provisions against acts of State legislature, 116 A. L. R. 1037.